# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **DENNIS CLAYTON and,** | ) | Tipton County Circuit Court |
| **GARDEN HOMES, INC.** | ) | No. 4282 |
|  | ) |  |
| Plaintiffs/Appellants. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9701-CV-00019 |
|  | ) |  |
| **UNION SAVINGS BANK**, | ) |  |
|  | ) |  |
| Defendant/Appellee. | ) |  |
|  | ) |  |

FILED

December 22, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

_____

From the Circuit Court of Tipton County at Covington.
**Honorable Joseph H. Walker, Judge**

**Michael L. Weinman**, TATUM & TATUM, Henderson, Tennessee
Attorney for Plaintiffs/Appellants.

**G. Michael Acree**, Covington, Tennessee
Attorney for Defendant/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

Dennis Clayton and Garden Homes, Inc. (GHI) appeal from the trial court's grant of

summary judgment in favor of Union Savings Bank (Bank).

The complaint filed by Clayton and GHI alleges that GHI, through its president Danny Anderson, entered into a Construction Loan Agreement on August 10, 1989 to borrow $200,000 from Bank for the purpose of constructing five homes. That sum was sufficient to complete construction of the homes except that, unknown to Clayton, Anderson had diverted approximately $35,000 of the original $200,000 for his own personal use. It is further alleged that on January 16, 1990, GHI entered into a new promissory note with Bank to borrow $50,000. The parties executed a Construction Loan Agreement for the construction of homes on lots 1 through 6 of Tract I of the Garden Hills Subdivision and lots 17 and 18 of Tract II of the Garden Hills Subdivision. Bank failed to disperse the proceeds of the second note according to the terms of the loan agreement but instead dispersed those proceeds to pay for construction of the initial five homes which were to be financed by the $200,000 loan. Clayton alleges that a document entitled Cross-Pledge Agreement which purports to contain his signature is a forgery.

It is further alleged that at least one of the directors of the Bank and/or members of their families provided materials and services to GHI for the construction of the first five homes. Some of the funds which were diverted from the $50,000 loan were used to pay debts owing to these businesses and that "this self-dealing by the Bank through its board of directors caused Plaintiff to lose in excess of several thousand dollars." It is further averred that the Bank conspired with Danny Anderson to defraud Clayton of funds borrowed from the Bank and that the Bank breached a duty owed to the plaintiffs by negligently, recklessly and/or knowingly allowing Danny Anderson to divert funds for his own personal use and gain.

Bank responded by a motion for summary judgment supported by the affidavit of Barnet G. Hall, III, president of Bank, wherein he identifies and attaches to his affidavit copies of the Construction Loan Agreement of August 10, 1989, the Construction Loan Agreement of January 16, 1990, a Cross-Pledge Agreement dated January 16, 1990, a corporate resolution dated August 8, 1989 and a Guaranty Agreement dated August 10, 1989 executed by Danny Anderson and Dennis Clayton. Clayton filed his affidavit in response to Bank's motion for summary judgment wherein he reiterates many of the allegations of the complaint. He avers that the actual cost of building the

first five homes was $199,965.02, slightly below the $200,000 loan proceeds; that he was not aware that Anderson was diverting these funds to the point there would not be enough left from the loan proceeds to complete the first homes until he was informed by Bank officer Jimmy Trotter in mid June of 1990. Shortly after the second loan agreement was entered into on January 16, 1990, Clayton was informed by Bank chairman Cole that the procedure to be used in disbursing the proceedings of the second loan were going to be changed in that the Bank would take over writing all the checks drawn on the Garden Homes line of credit. No explanation was given to Clayton at that time as to why this change was being instituted. Bank, without Clayton's knowledge or consent, disbursed approximately $32,000 from the proceeds of the second loan to pay for costs incurred in constructing the first five homes.

Plaintiffs present the following issues for our consideration:

> I. Whether the trial court erred in granting appellee's motion for summary judgment on the breach of contract claim because an issue of disputed fact exists as to whether the Bank was acting outside of its authority in the manner it disbursed the proceeds of the construction loan agreements.

> II. Whether the trial court erred in granting Appellee's motion for summary judgment on the breach of fiduciary duty, conspiracy to defraud and self-dealing claims because Appellee failed to meet its initial burden of demonstrating that no disputed issue of material fact exists on these claims.

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56 T.R.C.P., *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). In considering whether a motion for summary judgment was properly granted, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Byrd*, at 210-11. If a contract is plain and unambiguous, the meaning thereof is a question of law and it is the court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955); *Malone & Hyde Food Servs. v. Parson*, 642 S.W.2d 157, 159 (Tenn. App. 1982).

Bank contends that, when the documents are read together, it is authorized to apply the proceeds of one loan to another. Bank relies on the following language from the 1990 loan

construction agreement:

> No advance shall be due unless, in the reasonable judgment of Bank, all work which is usually done at the stage of construction when the advance is requested is done in a good and workmanlike manner, and all materials usually furnished and installed at such times are furnished and installed, but Bank may advance parts or the whole of any advance before it becomes due if Bank believes it is advisable to do so, and all such advances or payments shall be deemed to have been made in pursuance to this Agreement and not in modification thereof.

We are inclined to agree with Plaintiff's interpretation of this clause as allowing Bank to advance requests before the stage of completion set out in the agreement but does not give the Bank authority to disperse any portion of the proceeds except for the projects described in the agreement, to wit, lot numbers 1, 2, 3, 4, 5 and 6 of Garden Hills Subdivision, Section A and lots 17 and 18 of Garden Hill Subdivision, Section B.

Bank further relies upon the following language from the Cross Pledge Agreement:

> Now, in order to secure the prompt and full payment of each note of Borrower now or hereinafter held by Lender (hereinafter for convenience referred to as "The Notes") at its maturity or respective maturities, as well as each and every portion of each of the same that may be renewed to a more distant maturity, Borrower does hereby and by these presents pledge, pawn and deliver unto Lender, its transferees, successors and assigns, all of the Notes. The Notes so pledged herein to Lender shall be held by Lender as pledges and is hereby and shall remain pledged to secure the payment to Lender of each and every of the The Notes in full.

> It is the intent and purpose of this Agreement to fully secure Lender of all obligations, due by Borrower to Lender, and in the event that the security of any one or more of The Notes is not adequate or sufficient (in the sole discretion and judgment of Lender) at any point in time, and in such event the other Notes and their respective securities shall be held and used by Lender as cross collateral and security for such other Notes.

> Lender shall not be obligated to release or surrender any of the Notes or any of the securities represented thereby until fully satisfied that the remaining securities are adequate (in Lender's sole discretion and judgment and sufficient to fully repay all such remaining Notes.

> Lender is hereby authorized to collect (by suit, foreclosure or otherwise), from Borrower the full face principal amount of any Note though the full face amount of same may not be due thereon and apply the funds so received to the balance due on any other Note or Notes held by Lender.

This document was apparently executed in behalf of GHI by Danny Anderson, president, and Danny Anderson and Dennis Clayton individually. However, we have previously noted that Clayton alleges that his signature on this document is a forgery. While that assertion is not reiterated in his affidavit filed in response to Bank's motion for summary judgment, it is not refuted by Bank. The party moving for summary judgment bears the burden of demonstrating that no genuine issues of material fact exist. *Byrd v. Hall*, 847 S.W.2d at 210. As we interpret this language, the borrower pledges all of the notes it has with Lender to secure the repayment of all the notes. It allows the Bank to apply payments made by a lender to any of lender's notes held by the Bank. We do not find this language to authorize the Bank to use the proceeds from one loan to satisfy another.

Bank further relies upon a corporate resolution of the board of directors of GHI executed by Danny Anderson as president and Dennis Clayton as secretary. This authorizes the president of GHI to:

(a) Negotiate and procure loans from
Union Savings Bank, Covington, TN_____
       Name of Bank          Address
up to an amount not exceeding (if there is no limit, so indicate) <u>no limit</u> $_____ in the aggregate at any one time outstanding;
(b) Discount with said Bank, commercial or other business paper belonging to this Corporation, made or drawn by or upon third parties, without limit as to amount;
(c) Give security for any liabilities of this Corporation to said Bank by pledge or assignment or a lien upon any real or personal property, tangible or intangible, of this Corporation, and
(d) Execute in such form as may be required by the Bank all notes and other evidences of such loans, all instruments of pledge, assignment or lien, and that none of the same shall be valid unless so signed or endorsed, provided, however, that the endorsement of promissory notes discounted may be effected by any one of them.
"RESOLVED FURTHER, that said Bank be and it is hereby authorized and directed to pay the proceeds of any such loans or discounts as directed by the persons so authorized to sign, whether so payable to the order of any of said persons in their individual capacities or not, and whether such proceeds are deposited to the individual credit of any said persons or not;"
"RESOLVED FURTHER, that this resolution shall continue in force, and said Bank may consider the holders of said offices and their signatures, respectively, to be and continue as set forth in the certificate of the Secretary of this Corporation accompanying a copy of this resolution when delivered to said Bank or in any similar subsequent certificate, until notice to the contrary in writing is duly served on said Bank."

We find no language in this document to authorize the Bank to apply the proceeds of a particular construction loan agreement to anything other than the construction of that particular project.

The final document upon which Bank relies is entitled "GUARANTY." Pursuant to this agreement, Danny Anderson and Dennis Clayton agree to jointly and severally guarantee the full and prompt payment to Bank at maturity any and all indebtedness incurred by GHI. It is what is known as a continuing guaranty in that it remains in full force and effect until all of debtors indebtednesses are fully paid.[1] This document further provides:

> The liability hereunder shall in no wise be affected or impaired by (and said bank is hereby expressly authorized to make from time to time, without notice to anyone), any sale, pledge, surrender, compromise, settlement, release, renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or other disposition of any of said indebtedness, obligations and liabilities, either express or implied, or of any contract or contracts evidencing any thereof, or of any security or collateral therefor. The liability hereunder shall in no wise be affected or impaired by any acceptance by said Bank of any security for or other guarantors upon any of said indebtedness, obligations or liabilities, or by any failure, neglect or omission on the part of said Bank to realize upon or protect any of said indebtedness, obligations or liabilities, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of said Debtor, possessed by said Bank, toward the liquidation of said indebtedness, obligations or liabilities, or by any application of payments or credits thereon. Said Bank shall have the exclusive right to determine how, when and what application of payments and credits, if any, shall be made on said indebtedness, obligations and liabilities, or any part of them. In order to hold the undersigned liable hereunder, there shall be no obligation on the part of the said Bank at any time to first resort to, make demand on, file claim against, or exhaust its remedies against the Debtor, any one or more of the undersigned, or other persons or corporations, their properties or estates, or to resort to and exhaust its remedies against any collateral, security, property, liens or other rights whatsoever. It is expressly agreed that said Bank may at any time make demand for payment or payments on, or bring suit against, the undersigned guarantors, jointly or severally, or any one or more of the undersigned, less than all, without impairing the rights of the Bank against the others of the undersigned; and that the Bank may compound with any one or more of the undersigned for such sums as it may see fit and release such of the undersigned from all further liability to the Bank for such indebtedness without impairing the right of the Bank to demand and collect the balance of such

---

[1] We do note that the Guaranty agreement further provides that "[t]he right of recovery, however, against the undersigned is limited to Two Hundred Thousand and no/100------------ Dollars ($200,000.00) plus interest on all loans and/or advances hereunder and all expenses hereinbefore mentioned; . . ."

indebtedness from others of the undersigned not so released.

This document expressly authorizes Bank, without notice to anyone, to make modification or other disposition of any of said indebtedness, or of any contract or contracts evidencing any thereof. The January 1990 Construction Loan Agreement provides that "the loan contemplated hereby shall be evidenced and secured by the following instruments and documents, along with such other instruments and documents as the Bank may reasonably require." As we interpret this language contained in the Guaranty agreement, the Bank was authorized to apply the proceeds from the second note to complete the homes financed by the first note.

The plaintiffs further allege that a least one member of the Bank's board of directors and/or members of their family were paid for materials that went into the first project from loan funds that were loaned for the second project. It is not alleged that these were not bona fide debts and we therefore conclude that the Bank did not operate improperly or violate any duty to the plaintiffs by satisfying those indebtednesses. Furthermore, both Clayton and Anderson are individually liable on all of the notes pursuant to the Guaranty agreement.

The complaint further alleges that Bank "did conspire with Danny Anderson to defraud him (Clayton) of funds borrowed from the defendant. This conspiracy to defraud Plaintiffs resulted in severe economic hardship to the plaintiffs." All pleadings shall be so construed as to do substantial justice. Rule 8.06 T.R.C.P. However, when averring fraud, the circumstances constituting fraud shall be stated with particularity. Rule 9.02 T.R.C.P. It is not necessary to actually employ the word "fraud" as fraud is a legal conclusion drawn from the facts. *Sullivant v. Americana Homes, Inc.*, 605 S.W.2d 246, 249 (Tenn. App. 1980). The complaint in this cause fails to allege fraud with particularity.

Finally Plaintiff avers that Bank breached a duty owed to Plaintiff as customers by allowing Anderson to divert funds for his own personal use. As previously noted, the corporate resolution authorized the Bank to pay the loan proceeds "as directed by the persons so authorized to sign, whether so payable to the order of any of said persons in their individual capacities or not . . ." Clayton does not dispute that he executed the corporate resolution as corporate secretary.

We do not find the documents to be ambiguous.  While Mr. Clayton alleges that his signature was forged on the Cross Pledge Agreement, we do not find any language in that agreement to be pertinent to the issues before us.  The judgment of the trial court granting summary judgment in favor of the defendant is affirmed.  Costs of this cause are taxed to the Appellants.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
LILLARD, J. (Concurs)